915 F.2d 1584
 16 U.S.P.Q.2d 1873
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
NL INDUSTRIES, INC. and Baroid Corporation,
Plaintiffs/Cross-Appellants,
v.
EXPLORATION LOGGING, INC., Defendant-Appellant.
 Nos. 90-1040, 90-1041.
Federal Circuit.
 Sept. 25, 1990.
 Rehearing Denied Dec. 3, 1990.
Suggestion for Rehearing In Banc Declined Dec. 14, 1990.
 
 Before NIES, Chief Judge, COWEN, Senior Circuit Judge and MICHEL, Circuit Judge.
 DECISION
 PER CURIAM:
 
 
 1
 NL Industries, Inc. and Baroid Corporation (collectively NL) sought a declaratory judgment in the United States District Court for the Southern District of Texas that U.S. Patent No. 4,216,536 ('536 patent or the More patent), belonging to Exploration Logging, Inc. (Exlog), was invalid and not infringed by NL. Exlog counterclaimed asserting that the '536 patent was valid and infringed, and that the infringement was willful.[1]
 
 
 2
 In Appeal No. 90-1040, Exlog appeals from the final judgment of the court, Civ. No. H-86-1761 (September 6, 1989), holding, inter alia, that claims 5, 8 and 15 of Exlog's patent are invalid under 35 U.S.C. Sec. 103 (1988). In Appeal No. 90-1041, NL appeals from that part of the judgment holding that claims 2, 3, 6, 9 and 13 of the '536 patent are not invalid under section 103. We affirm in Appeal No. 90-1040, and reverse in Appeal No. 90-1041. We vacate the judgment as to Claim 8 which Exlog admits is not infringed and as to which NL seeks no judgment.
 
 ANALYSIS
 
 3
 The claims of the '536 patent are directed to an apparatus and methods used for transmitting data, recorded downhole, up to the drilling platform using pressure pulses in the mud circulated through the drill string. The transmission of data through this mud to the surface, which is known as Mud Pulse Telemetry (MPT), is useful in guiding the drilling operation and determining the physical properties of the strata.
 
 Claims 5 and 15
 
 4
 Claim 5 concerns the sensing and storing of data in a downhole microprocessor when the mud is not circulating, and the subsequent transmitting of that data when the mud is circulating. Claim 15 is directed to an apparatus which includes a side wall port for accessing the computer when that drilling section is raised out of the well. The district court held that both claims 5 and 15 were invalid for obviousness.
 
 
 5
 Exlog principally attacks the district court's failure to give controlling weight to the asserted objective evidence of non-obviousness, i.e., copying, commercial success, laudatory comments, long-felt need, skepticism, and grant of foreign patents. However, the trial court, in its opinion, stated that it had "carefully considered" the objective evidence and had found it "not especially weighty or persuasive." NL Indus., Inc. and Baroid Corp. v. Exploration Logging, Inc., Civ. No. H-86-1761, slip op. at 12 (S.D.Tex. September 6, 1989).
 
 
 6
 No error arises because the court did not engage in a lengthy discussion of the proffered objective evidence. FMC Corp. v. Hennessy Indus., Inc., 836 F.2d 521, 524, 5 USPQ2d 1272, 1274 (Fed.Cir.1987). Exlog has indicated its dissatisfaction with the weight accorded this evidence; it has failed, however, to sustain its burden of showing that the proffered evidence merits greater weight than it was given. Nor has Exlog shown that the trial court incorrectly applied the law. See Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed.Cir.1983). Moreover, Exlog fails to point to any evidence of a nexus between the inventions of the claims and the objective evidence. See Cable Elec. Products, Inc. v. Genmark, Inc., 770 F.2d 1015, 1026, 226 USPQ 881, 889 (Fed.Cir.1987).
 
 
 7
 Exlog also ascribes error to the court's holding of obviousness on claims 5 and 15, based on, inter alia, use of hindsight, reliance upon erroneous and ambiguous prior art, failure to consider the claimed invention as a whole, and improper redefinition of the claimed invention. Having studied the relevant prior art and testimony, we conclude that Exlog has not shown that the law was applied improperly, or that the underlying factual determinations of the court were clearly erroneous. Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1569 n. 12, 1 USPQ2d 1593, 1598 n. 12 (Fed.Cir.), cert. denied, 481 U.S. 1052 (1987). The court did not, for example, err, as Exlog urges, by relying on the Eberstadt Report concerning the Schlumberger device to the extent the report presented valid teaching. See Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551, 13 USPQ2d 1301, 1304 (Fed.Cir.1989).
 
 
 8
 Except for generating, recording and transmitting datum, rather than data, the method of claim 5 reads literally on Varney. Gearhart and Teleco teach storing and transmitting data; the former when the mud pump is off, the latter when it is on. The substitution of a battery for a turbine as the power source is amply supported by testimony to be within the skill of the art and there was motivation to do so.
 
 
 9
 In sum, we agree with the district court's legal conclusions based on the record evidence that Claims 5 and 15 are invalid for obviousness.
 
 Claims 2, 3, 6, 9 and 13
 
 10
 Claims 2, 3, 6, 9 and 13 all require the comparison of data which is recorded and stored downhole and later brought to the surface, with data telemetered to the surface in real-time. Claim 2 is treated as a typical comparison claim.
 
 
 11
 Eaton discloses generating data at an offshore oil well rig, storing the data at that location, converting the data to digital signals, and then transmitting it by microwave or telephone to an onshore location. The data received onshore is recorded and later compared with the data recorded offshore. Eaton's article differs from claim 1, on which claim 2 depends,[2] because Eaton's information is not sent by MPT, and because Eaton records at the surface of the well and transmits onshore, whereas claim 1 records downhole and transmits to the surface.
 
 
 12
 Although Eaton differs specifically, it teaches the verifying steps of generating data at one location, storing data at that location, telemetering signals corresponding to that data to a remote location, recording the telemetered signals at the remote location, and thereafter transferring the stored data from the first location to the remote location for comparison with the telemetered data. As found by the district court, recording data downhole was well known in the industry, as disclosed in the Diely, McCracken and Anghern references, and generating and telemetering data from downhole was taught by the prior art Gearhart and Spinnler references.
 
 
 13
 Moreover, while the Eaton article does not teach an ongoing comparison, there is no suggestion in Eaton or any of the prior art references which would lead one away from repeating the process. No technical modification would be necessary, because the same operation is just repeated. The evidence in the record supports the conclusion that repeating the comparing process would have been obvious to one of ordinary skill in the art. See generally In re Dilnot, 319 F.2d 188, 138 USPQ 248 (CCPA 1963) (continuous operation obvious in light of batch process). Additionally, if such a teaching is necessary, Dulaney discloses a system of continuous comparison of transmitted data.
 
 
 14
 Spinnler describes the testing of an MPT system to verify the accuracy of telemetered data. Prerecorded data placed downhole was transmitted to the surface using MPT and then recorded. The received data was then compared with the original prerecorded data to verify whether the signals sent by MPT were correct.
 
 
 15
 Spinnler is unlike More in that the data sent to the surface was not generated in sensors downhole: instead, prepared signals were placed downhole. The prepared data was transmitted and compared with the original prepared data to verify its proper transmission. While Spinnler is not directed at transmission of real-time data, it teaches the process for achieving More's purpose of determining the accuracy of data transmitted by MPT.
 
 
 16
 Dulaney discloses a system which continuously compares the accuracy of transmitted data over a communication channel or telemetry link. In Dulaney, data is recorded at the site of transmission and also at the receiving point. The data at the receiving point is then transmitted back to the point of transmission and compared with the data originally recorded at the transmission point. Dulaney discusses comparison in connection with banking transactions but specifically recognized that the system could have widespread application. The trial court clearly erred in finding Dulaney compares predetermined data. We surmise that the trial court misinterpreted the teaching in the invention that corrective action may be taken when a predetermined error level rate is exceeded.
 
 
 17
 The teachings of Dulaney are on point, the only distinction being that it is not specifically directed at verifying well data. However, since Dulaney is directed to the problem faced by More, it is analogous art and is within the scope of the relevant prior art. In re Deminski, 796 F.2d 436, 442, 230 USPQ 313, 315 (Fed.Cir.1986); and In re Wood, 599 F.2d 1032, 1036, 202 USPQ 171, 174 (CCPA 1979).
 
 
 18
 As supported by the testimony and references, the invention of claim 1, except for the environment of use, is taught by the prior art, and claim 1's use is within the teaching of Dulaney. The comparison step to test the accuracy of transmitted data is found in Eaton, Spinnler and Dulaney. The problems encountered in the transmission of data from downhole to the surface, through telemetry, were well known in the industry. This is the exact reason for the comparison of recorded and transmitted data in Spinnler. Moreover, telemetering data from downhole is taught specifically in Spinnler and Gearhart which employ mud pulse telemetry, the only additional step of claim 2.
 
 
 19
 We conclude from the combined corrected teachings of the references, that claim 2 of the '536 patent would have been obvious to one of ordinary skill in the art and the claim, therefore, is invalid under Sec. 103. In re Keller, 642 F.2d 413, 425, 208 USPQ 871, 881 (CCPA 1981).
 
 
 20
 Claim 3 adds to the method of claim 1 means for recording the time at which signals are stored and received. It is undisputed that comparison must be made of signals in the same timeframe. Claim 13 is an apparatus claim of the scope of claim 3. Claims 6 and 9 merely add comparison steps to invalid claims 5 and 7. We conclude that the prior art teachings also render these claims invalid under Sec. 103. See ACS Hospital Systems, Inc. v. Montefiore Hospital, 732 F.2d 1572, 1577, 221 USPQ at 929, 933 (Fed.Cir.1984).
 
 Inequitable Conduct, Infringement, Damages
 
 21
 Because we hold that all of the claims at issue are invalid for obviousness, we do not address the issues of inequitable conduct, infringement, patent marking and willful infringement.
 
 Costs
 
 22
 Each party shall bear its own costs.
 
 Motions
 
 23
 The pending motion by Exlog is rendered moot.
 
 
 
 [1]
 Exlog withdrew its counterclaim as to claims 8 and 9 after trial
 
 
 [2]
 Claim 1 was not asserted in the suit